**FRAMINGHAM TRUST COMPANY**
v.
**GOULD-NATIONAL BATTERIES, INC.**

**AMERICAN CASUALTY COMPANY**
v.
**FRAMINGHAM TRUST COMPANY.**
Civ. A. Nos. 67–936, 68–207.

United States District Court
D. Massachusetts.
Dec. 30, 1969.

Joseph L. McQuade, Sheridan & Randall, Framingham, Mass., for Framingham Trust Co.

Samuel H. Cohen, Cohen & Galvin, Harry M. Shuman, Boston, Mass., for Gould National Batteries, Inc.

Samual H. Cohen, Boston, Mass., for American Cas. Co.

Harry Shuman, Boston, Mass., for Gould National Batteries, Inc.

George F. Mahoney, Boston, Mass., for Langan.

Joseph L. McQuade, Framingham, Mass., for Framingham Trust Co.

## OPINION

GARRITY, District Judge.

This is a diversity action brought under the Declaratory Judgments Act, 28 U.S.C. § 2201. The matter is presently before the court on crossmotions for summary judgment. At issue are the rights to unpaid contract balances and retainages in the hands of an owner at the time of default by a contractor. The plaintiff, American Casualty Company ("the Surety"), claims the funds in question under the doctrine of equitable subrogation. The defendant, Framingham Bank and Trust Company ("the Bank") claims them on the basis of an assignment of contract rights, under the Uniform Commercial Code, Mass.G.L. c. 106, assigned to the Bank by the construction contractor whose performance of the contract was presumably financed by the Bank to a large extent. The defendant Langan is the receiver in bankruptcy of the defaulted contractor, Sewell & Smith Construction Company. He has renounced any claim in this case to rights superior to those of either the Surety or the Bank. Defendant Gould-National Batteries, Inc., is the owner of the property under construction and party to the construction contract with Sewell & Smith. Gould-National is also the obligee of the surety bonds. It makes no claim with respect to the funds in question and is a mere stakeholder as to that part remaining in its possession.[1] The facts set forth in the

1. The earlier action, C.A. No. 67-936, which has been consolidated with the complaint for declaratory judgment, is a claim by the Bank against Gould-National for sums due it as assignee of Sewell & Smith. That suit was initiated in the Massachusetts Superior Court and removed to this court. While removal was in process, the Surety filed the complaint for declaratory judgment joining the Bank, Gould-National and Sewell & Smith's receiver as parties defendant. Thus the determination of the declaratory judgment complaint will also determine the issues in the removed case.

following paragraphs are either undisputed or have been stipulated.

### Findings of Fact

1. On December 3, 1965 Sewell & Smith executed a security agreement with the Bank assigning its accounts and contract rights as security for repayment of money loaned then and thereafter. The financing statements were duly recorded in the office of the clerk of the Town of Framingham on December 28, 1965 and in the office of the Secretary of State on December 29, 1965.

2. On May 23, 1966 Sewell & Smith executed a contract with Gould-National for the construction of an addition to its factory building located in Marlboro, Massachusetts. The contract price was $133,000. The contract, in article 5, and the "General Conditions" of the American Institute of Architects which were incorporated in it by reference, in articles 24 and 25, conditioned Sewell & Smith's right to payments upon its proving to the extent required by the architect that it had paid for materials and labor connected with the work. Article 22 of the general conditions permitted termination should the contractor fail to make prompt payment to subcontractors or for material or labor. Article 26, entitled "Payments Withheld" provided,

> The Architect may withhold or, on account of subsequently discovered evidence, nullify the whole or a part of any certificate to such extent as may be necessary in his reasonable opinion to protect the owner from loss on account of: * * * c) Failure of the Contractor to make payments properly to subcontractors or for material or labor.

Article 32, "Liens", provided,

> Neither the final payment nor any part of the retained percentage shall become due until the Contractor, if required, shall deliver to the owner a complete release of all liens arising out of the contract, or receipts in full in lieu thereof and, if required in ei-

ther case, an affidavit that so far as he has knowledge or information the releases and receipts include all the labor and material for which a lien could be filed.

Articles 36 and 37 provided that the contract created no contractual relation between any subcontractor and the owner; and that the owner was under no obligation to pay to or see to the payment of any sums to any subcontractor.

3. Also on May 23, 1966 the Surety and Sewell & Smith, as principal, executed both a performance bond and a labor and material payment bond in favor of Gould-National, as obligee, guaranteeing performance of the contract and payment of labor and material claims. These bonds were not recorded in any official registry or office.

4. On or about February 16, 1967 Sewell & Smith gave notice to Gould-National and the Surety of its inability to complete the contract and it formally acknowledged its default. On December 27, 1967 Sewell & Smith was adjudicated a bankrupt.

5. Following Sewell & Smith's default, Gould-National made demand upon the Surety to complete the job and the Surety complied. The amount expended by the Surety under its performance bond was $3,237.94. The cost of finishing the work was less than 2.5% of the contract price of $133,000, indicating that at the time of default the actual construction was all but complete. As a result of the decision in National Shawmut Bank of Boston v. New Amsterdam Casualty Company, 1 Cir. 1969, 411 F.2d 843, the bank does not contest the Surety's right to the $3,237.94 it spent completing the job. However, at the time of its default Sewell & Smith was delinquent in payments to its workers and suppliers to the extent of $53,293.07, which sum the Surety was obliged to pay to the contractor's laborers and materialmen under its payment bond.

6. The Surety claims $25,691.60, which represents all contract balances

and retainages not paid by Gould-National to the contractor.[2] The Bank claims $22,453.66 of that amount as the assignee of Sewell & Smith's contract rights. The Bank concedes that the difference, $3,237.94, belongs to the Surety as reimbursement of its costs in completing the contract. From the total sum, Gould-National paid the Surety $19,089.10 on December 7, 1967.

7. Both the losses suffered by the Surety and the amount of Sewell & Smith's indebtedness to the Bank now and at the time of default are in excess of the $25,691.60 contract balances and retainages withheld by Gould-National.

8. The workers and suppliers to whom Sewell & Smith was delinquent took no action to create liens against Gould-National's property pursuant to Mass.G.L. c. 254, § 4, nor against funds in its hands pursuant to Mass.G.L. c. 254, § 31.

### Conclusions of Law

This case presents another facet of the general problem discussed in National Shawmut Bank of Boston v. New Amsterdam Casualty Company, supra, of the relative priority of the claims of an assignee bank with a perfected security interest and a performing surety company to funds due a defaulting construction contractor by the owner of the premises on which the construction contract was being performed. The National Shawmut Bank case held that a surety completing a contract under its performance bond had priority over a bank holding a security interest in the contractor's accounts receivable by virtue of the surety being subrogated to the right of the Government, as owner in that case, to apply to the cost of completion whatever indebtedness or retainages remained in its hands at the time of default.[3] The dispute here relates to the surety's payments under its payment bond of an amount in excess of the sum in the hands of the owner at the time of the contractor's default, which sum is also less than the amount due the assignee bank.

There are other differences in the case at bar from the situation in the National Shawmut Bank case than the type of bond involved. Here the owner is a private party, there it was the United States; and the Miller Act, is of course, inapplicable. Also, the bank here has chronological priority over the Surety, in that the loan and the perfection of the Bank's security interest under Mass.G. L. c. 106 preceded by five months the formation of the construction contract and the entrance of the surety company into the picture.

Turning to the merits of the subrogation question here presented, it is clear that the Surety obtained no rights by stepping into the shoes of the contractor "which on default has forfeited its rights." National Shawmut Bank of Boston v. New Amsterdam Casualty Company, supra at 848. Nor did the Surety acquire a position superior to the Bank's by stepping into the shoes of laborers and materialmen. The provisions of the construction contract, whereby the architect might withhold payments under the contract until satisfied that laborers and materialmen had been paid, created no right for the benefit of laborers and materialmen whereby they might sue the owner for the value of their services and supplies. This is clear not only from articles 36 and 37 of the contract's General Conditions but also under Massachusetts law. See Ehr-

---

2. It is unclear whether this sum of $25,691.60 was already due the contractor at the time of his default or is simply the total of what would have become due had he completed the contract. For purposes of this decision, however, we may assume that, but for the claims of the Surety, the Bank as assignee of Sewell & Smith would have had rights to the total $25,691.60.

3. As heretofore noted, the bank in the instant case concedes the surety's entitlement to the amount of $3237 expended by the surety under its performance bond.

lich v. Johnson Service Co., 1930, 272 Mass. 385, 172 N.E. 508, 70 A.L.R. 979.[4] Nor did the workers or materialmen endeavor to obtain statutory liens against the funds in the owner's hands or against his property.

Did the Surety succeed to rights of the owner superior to those of the assignee Bank? This is a closer question due to the breadth and strength of the doctrine of equitable subrogation stated in Pearlman v. Reliance Ins. Co., 1962, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190. That was a case in which the surety on a payment bond for a defaulting Government contractor prevailed over a trustee in bankruptcy by virtue of equitable subrogation. Although the workers and suppliers had no enforceable rights against the United States for their compensation, the court ruled, at 141, 83 S.Ct. 232 at 237, "that the Government had a right to use the retained fund to pay laborers and materialmen" and a concurring opinion said, at 143, 83 S.Ct. 232 at 238, that the money in the hands of the United States "was clearly applicable to payment of any debt under the contract." The reason why the Government could properly pay laborers and materialmen out of the retained fund, although it could not be sued by them, is not entirely clear to us. Perhaps it was a moral obligation of the Government consistent with the policy of the Miller Act to see that laborers and materialmen

were paid. Cf. Continental Casualty Company v. United States, 1959, 169 F. Supp. 945, 145 Ct.Cl. 99. See generally, Note, Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety, (1962) 71 Yale L.J. 1274; Recent Cases, Subrogative Rights of a Surety on a Government Contractor's Bond, (1963) 16 Vand.L.R. 448. Or it may have been the absence of competing claims of creditors of the contractor other than the general creditors represented by the trustee in bankruptcy.

The question thus becomes whether the courts of Massachusetts, whose law plainly governs, would hold in favor of the Surety on the basis of the principles discussed in the *Pearlman* case. We think they would not, because any assumed right of an owner to make payments to laborers and materialmen not having liens would circumvent the comprehensive scheme of remedies available to laborers and materialmen under Massachusetts statutes. Under Mass.G. L. c. 254, § 4, a laborer or materialman may obtain a lien against the real estate of an owner by filing an actual notice to the owner that labor or material is to be furnished under a contract with the contractor.[5] Under § 31 of the same chapter a laborer or materialman may obtain a lien upon proper filing and notice against sums due or to become due from an owner to a contractor who is adjudged a bankrupt or makes a general

4. In this case the contract provided explicitly that the owner could apply funds in his hands to pay unpaid laborers and suppliers and that such payment would be considered as payment under the contract. The Supreme Judicial Court concluded, at 390, that this was inserted merely for protection against possible liens against the owner's property and that there was no intention to create even an equitable lien that would defeat a trustee in bankruptcy's claim of a voidable preference.

5. Mass.G.L. c. 254, § 4, provides, "Whoever, subsequent to the date of the original contract, furnishes labor or material, or both labor and material, or performs labor, under a written contract with a contractor, or with a subcontractor

tor of such contractor, may file in the registry of deeds for the county or district where such land lies a notice of his contract * * *. Upon filing a notice, as hereinbefore provided, and giving actual notice to the owner of such filing, the subcontractor shall have a lien to secure the payment of all labor and material, which he shall thereafter furnish, upon the building or structure, and upon the interest of the owner, as appears of record at the time of such filing, in the lot of land on which said building or structure is situated. But such lien shall in no event exceed the amount due or to become due under the original contract when notice of the filing of the subcontract is given by the subcontractor to the owner * * *."

assignment for the benefit of creditors or for whom a receiver is appointed on account of insolvency. Moreover, § 31 expressly subordinates the lien it establishes to any other liens which may have arisen under other applicable provisions of the General Laws. This would include a bank's security interest created under the Uniform Commercial Code. While the court has found no Massachusetts case directly in point, dictum in National Shawmut Bank, *supra*, 411 F. 2d at 845, seems relevant, to the effect that the surety stands "in the shoes of laborers and material men who have been paid by the surety—*who may have had liens*." (Emphasis added.)

The court therefore concludes that in the instant case Gould-National had no rights under Massachusetts law to which the Surety might be subrogated under the doctrine of equitable subrogation. Parenthetically, the court does not rely upon the fact that the Bank obtained its security interest previous to the Surety's issuing its payment bond. While this fact may be a circumstance of some general equitable significance,[6] it seems irrelevant to an analysis of the Surety's rights under the doctrine of equitable subrogation. The Bank's security interest attaches only to assets of the contractor and if the owner were entitled to make payments to laborers and material-men not having liens, the effect would be to deprive the contractor of assets in the form of accounts receivable to which the Bank's security interest might attach.

Accordingly, the court declares in C.A. 68–207 that American Casualty Company is entitled to only $3,237.94 of the contract balances and retainages due under the contract between Sewell & Smith Construction Company and Gould-National Batteries, Inc. This sum represents the cost of completing the contract under the performance bond. The remaining $22,453.66 is rightfully claimed by Framingham Trust Company by virtue of its perfected security interest in Sewell & Smith's contract rights. American Casualty Company, therefore, has no legal claim to $15,851.16 which it received on December 7, 1967 out of the retainages held by Gould-National.[7] That sum represents the difference between the $3,237.94 cost of completion under the performance bond and the $19,089.10 actually paid by Gould-National to American Casualty Company.

With respect to the consolidated action by Framingham Trust Company against Gould-National Batteries, Inc., C.A. No. 67–936, the court orders that summary judgment be entered for the plaintiff in the amount of $22,453.66 plus interest from December 7, 1967.

---

6. This fact also serves to distinguish this case from the situation presented in Pearlman v. Reliance Ins. Co., *supra*, and National Shawmut Bank of Boston v. New Amsterdam Cas. Co., *supra*, and other leading decisions on equitable subrogation, e. g., Prairie State National Bank v. United States, 1896, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, and Henningsen v. U.S.F. & G., 1908, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, in all of which issuance of the surety company bond antedated the bank loan.

7. Judgment may not be entered for Gould-National against American Surety Company for this amount, plus interest from December 7, 1967, because it filed no cross-claim. However, it is expected that American Casualty Company will repay it to Gould-National without new litigation, or better still, to the Framingham Trust Company to be applied on account of Gould-National's liability to the Bank.