**FRAMINGHAM TRUST COMPANY,**
Plaintiff, Appellee,

v.

**GOULD–NATIONAL BATTERIES, INC.,**
Defendant, Appellant.

**AMERICAN CASUALTY COMPANY,**
Plaintiff, Appellant,

v.

**FRAMINGHAM TRUST COMPANY**
et al., Defendants, Appellees.

Nos. 7523, 7524.

United States Court of Appeals,
First Circuit.

Heard May 4, 1970.

Decided June 8, 1970.

Samuel H. Cohen, Boston, Mass., Avram G. Hammer and Cohen & Galvin, Boston, Mass., on brief, for appellant American Cas. Co.

Harry M. Shuman and Berman & Shuman, Boston, Mass., for Gould-National Batteries, appellant.

Joseph L. McQuade, Framingham, Mass., Sheridan & Randall, Framingham, Mass., on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Sewell & Smith Construction Company (the contractor) agreed to construct a factory addition for Gould-National Batteries, Inc. (the owner) for $133,000.[1]

---

1. The pertinent provisions are Article 5 of the Contract, and Articles 22, 26, 32, 36 and 37 of the General Conditions of the American Institute of Architects, which were incorporated by reference into the main contract. Summarized, the contractor's right to final payment was conditioned on satisfactory completion and

Framingham Trust Company (the bank) agreed to provide the financing on the security of an assignment of the contractor's present and future accounts receivable, which financing agreement was duly executed and recorded. American Casualty Company (the surety) furnished the performance and payment bonds for the contractor as required by the owner. On default by the contractor, the surety completed the work at an outlay of some $3000, paid some $50,000 to previously unpaid laborers and materialmen, and then sought to be reimbursed by the owner out of the unpaid balance owing for the completed work. The bank concedes the surety's right to the $3000 for completion of the work, but claims that it—not the surety—is entitled to the remainder of the unpaid balance held by the owner at the time of default. The owner, having conceded liability for the unpaid balance, is involved only as the stakeholder.[2]

■ The district court granted summary judgment for the bank, holding that its rights as assignee with a perfected security interest had priority over

the subrogation rights of the performing surety.[3] 307 F.Supp. 1008 (D.Mass. 1969). We reverse. In National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843 (1st Cir. 1969), we held that the surety's right of subrogation survived the passage of the Uniform Commercial Code in Massachusetts and prevailed over the bank's security interest in the unpaid balance.[4] In discussing the extent of the surety's subrogation rights, we stated, at 848, that the performing surety

"is subrogated not only to the right of the government [the owner] to pay laborers and materialmen from funds retained out of progress payments [citing cases], but also to the government's right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default [citing cases].

The bank concedes the second proposition but contests the former. However, that proposition was reaffirmed in American Fire & Casualty Co. v. First National City Bank of New York, 411 F.2d 755, 758 (1st Cir. 1969), cert. de-

on evidence that all bills had been paid (Article 5); the owner had the right to terminate if the contractor should fail to make prompt payment to subcontractors or for material and labor (Article 22); the owner's architect had the right to withhold the certificate prerequisite to any payment, to protect the owner from loss on account of failure of the contractor to pay subcontractors, laborers, or materialmen (Article 26); final payment was to be conditioned on a release of all liens or its equivalent (Article 32); and no contractual relation between owner or subcontractor or obligation on the part of the owner to pay any subcontractor was created by the contract (Articles 36 and 37).

2. The case presently before us began as two separate suits. In No. 7523, the bank sued the owner in a state court for the unpaid balance held by the owner at the time of default. That case was removed to the federal district court and consolidated with No. 7524, wherein the surety sued the bank, the owner, and the contractor's receiver in bankruptcy for the same unpaid balance.

3. In so holding, the court did not place any reliance on the priority in time of the bank's security interest, deeming this fact of "some general equitable significance * * * [but] irrelevant to an analysis of the Surety's rights under the doctrine of equitable subrogation". We agree. American Fire & Casualty Co. v. First National City Bank of New York, 411 F.2d 755 (1st Cir. 1969).

4. We acknowledge a case note arrestingly captioned "National Shawmut Bank: Another Step Toward Confusion in Surety Law", 64 Northwestern L.Rev. 582 (1969). While we are chided for not holding that the surety's interest was a security interest subject to the filing and priority provisions of the U.C.C., we take comfort from ˙the observation that we were in harmony with the approach of French Lumber Co. v. Commercial Realty & Finance Co., 346 Mass. 716, 195 N.E. 2d 507 (1964), and that our holdings in *National Shawmut, American Fire,* and in the instant case are consistent with the results urged in the note (a) were the U.C.C. to govern and (b) were it to be amended as urged therein. *Id.* at 596–7.

nied, 396 U.S. 1007, 90 S.Ct. 563, 24 L.Ed.2d 499 (1970), wherein we upheld the performing surety's right to such unpaid progress payments and unpaid balance as reimbursement for its payments to previously unpaid laborers and materialmen. While we think those decisions dispositive of the issue here presented, we add a few brief comments in response to the reasons found persuasive by the district court in reaching a contrary decision.

■ First, as indicated by our decision in *American Fire & Casualty Co.,* *supra,* we do not understand the propositions enunciated in *National Shawmut Bank* to be confined to cases arising under the Miller Act, where the United States is the owner. The government's well established right to have the laborers and materialmen paid out of the unpaid progress payments or unpaid balance does not arise from any legal obligation to such suppliers but simply from its equitable obligation to those who provide it with labor and materials. United States v. Munsey Trust Co., 332 U.S. 234, 240–241, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Henningsen v. Unit-

ed States Fidelity & Guaranty Co., 208 U.S. 404, 410, 28 S.Ct. 389, 52 L.Ed. 547 (1908); National Surety Corp. v. United States, 133 F.Supp. 381, 383–384, 132 Ct.Cl. 724 (1955), cert. denied sub nom., First National Bank in Houston v. United States, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955); *see* Pearlman v. Reliance Insurance Co., 371 U.S. 132, 136–139, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). We see no reason why that same equitable obligation to the laborers and materialmen should not exist on the part of the non-government owner, who receives the same benefit from those suppliers—construction work and materials—as did the government in the aforementioned cases.[5] Moreover, the non-government owner, like the government, has an interest in seeing its suppliers paid so that the work necessary for completion of the contract can be done with minimum disruption and expense.[6] *See also* National Surety Corp. v. United States, *supra,* 133 F.Supp. at 383.

■ Therefore, since both the government and the non-government owner have the right to pay their suppliers out of the unpaid balance,[7] the performing

5. The equitable obligation—as *Munsey Trust Co.* and the other cases cited in text *supra* clearly suggest—does not arise by operation of the Miller Act or its predecessors but simply from a recognition of "the peculiarly equitable claim of those responsible for the physical completion of building contracts to be paid from available moneys ahead of others whose claims come from the advance of money." Munsey Trust Co., *supra,* 332 U.S. at 240, 67 S.Ct. at 1602. The Miller Act is simply one means of assuring that the government takes various steps to fulfill that obligation. National Surety Corp. v. United States, *supra,* 133 F. Supp. at 384. Those same means were employed by the owner in this case, by requiring the contractor to obtain a payment bond.

6. Article 22 of the General Conditions impliedly recognizes this interest. By specifying that the owner can terminate the contract when bills for labor and material are not promptly paid and can proceed to finish the job, the Article sug-

·gests to us that payment of the bills is part of finishing the job.

7. The bank, *not* the district court, relies on Ehrlich v. Johnson Service Co., 272 Mass. 385, 172 N.E. 508, for the proposition that the owner has no right to pay the laborers and materialmen in Massachusetts. In that case the owner had retained funds which were owing to a contractor who subsequently went into bankruptcy. There was no suggestion that the contractor had defaulted. The owner's payments to the contractor's subs were held to be preferences to general creditors. That case has nothing to do with the rights of a performing surety after the default of his principal, nor with the right of an owner who has required a payment bond to pay suppliers of goods and services after default by the contractor. As the Supreme Judicial Court specifically noted, "Prairie State [National] Bank [of Chicago] v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, and Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. [389] 404, 52 L.Ed. 547,

surety, through subrogation, is entitled to assert that right, and prevail over the secured creditor. *National Shawmut Bank, supra,* 411 F.2d at 848. The district court suggested, however, that according such right to the surety would circumvent the Massachusetts lien statutes, the materialmen and suppliers having failed to perfect a lien under Massachusetts General Laws, chapter 254, section 4, at the time of default. However, those lien statutes are circumvented just as much—or as little [8]—by according the surety the right to be reimbursed for labor and material costs incurred *subsequent* to default, which right the district court readily recognized. We fail to see why it should preclude reimbursement to the surety for labor and material costs incurred prior to default when it clearly does not have that effect on reimbursement for such costs incurred after default.

In sum, we cannot escape the conclusion that in both a practical and a legal sense, the payment of previously unpaid laborers and materialmen is a cost of completing the contract.

In No. 7524, the judgment should be reversed and judgment entered for the surety for the entire unpaid balance in the possession of the owner at the time of default, the surety's cost of completing the contract and paying the previously unpaid laborers and materialmen having exceeded the amount of such unpaid balance. In No. 7523, the judgment should be reversed and the action dismissed.

Reversed and remanded for appropriate action.

recognize the right of subrogation of a surety of the contractor to sums due to the contractor but retained by the contractee under the terms of the contract until the contract has been performed. These cases are not relevant to the question involved in the case at bar." 272 Mass. at 390, 172 N.E. at 510.

8. We note that section 1 of chapter 254 allows liens for labor alone to be filed for prior work done with the owner's consent within forty days of filing. Since subcontractors, or employees of the contractor or subcontractor, could have claimed such liens at the time of default, surely it could not be argued that allowing reimbursement from unpaid balances to the surety who paid such claims circumvented the lien statutes. Indeed, payment by the surety, a more expeditious procedure than pursuing bills in equity to decree, would in such case be supportive of the lien system.