**In re CARIBBEAN RESORT CONSTRUCTION AND MAINTENANCE, INC., Debtor.**

**Caribbean Resort Construction and Maintenance, Inc., Plaintiff,**

**v.**

**Coco Beach Utility Company, Inc., Defendant.**

**Bankruptcy No. 01–12505 (ESL). Adversary No. 02–0003.**

United States Bankruptcy Court, D. Puerto Rico.

July 10, 2003.

Charles Cuprill, San Juan, PR, for Debtor.

## OPINION AND ORDER

ENRIQUE S. LAMOUTTE,
Bankruptcy Judge.

This case is before the court upon several[1] suppliers' request to withdraw monies consigned with the Clerk of the Court for the payment of their services and/or materials, on the grounds that the consigned funds are not property of the estate under Section 541 of the Bankruptcy Code and applicable Puerto Rico law. The debtor opposed the suppliers' request on the grounds that the consigned funds are property of the estate, and the suppliers are general unsecured creditors under the

Bankruptcy Code. For the reasons set forth below, we find that the consigned funds are not property of the estate under section 541(a)(1) of the Bankruptcy Code.

### Factual and Procedural Background

On July 26, 2000, the debtor Caribbean Resort Construction and Maintenance, Inc. ("Caribbean") entered into a Construction Contract (the "First Contract") with Coco Beach Development Corporation, the owner of the construction project ("Coco Beach" or the "Owner"), for the installation of a fourteen-inch diameter ductile iron pipeline for potable water from Puerto Rico Road number 3 to the project. On that same date, Caribbean and Coco Beach Utility Company, Inc. ("Coco Beach Utility") executed a second Construction Contract ("Second Contract") for the installation of a sanitary sewer line.

The First Contract provides the terms and conditions for progress or partial payments, and the final payment. Article 5.2.2 of the First Contract provides that "the rate of retainage shall be 10% which will be released at the acceptance by Owner of the work." Article 5.3.1 provides that "upon acceptance of the Contractor's Work by the Owner, and upon the Contractor furnishing evidence of fulfillment of the Contractor's obligations in accordance with the Contract Documents and Article 5.3.2, the Owner shall forward the contractor's application for final payment without delay." Article 5.3.2 provides that:

> Before the Owner shall be required to forward the Contractor's application for final payment, the contractor shall submit to the Owner (a) an affidavit that payrolls, bills for materials and equip-

---

1. P.R. Precast Concrete made the request in the instant adversary proceeding, while Comercial Adolfo S. Pagán, Inc. ("CASP") made the request through a motion to lift stay in the bankruptcy case. The issues were consolidated in this adversary proceeding. On January 9, 2002, debtor also filed adversary proceeding number 02–0004 against Coco Beach Development Corporation for collection of moneys which involves the payment to supplier Mocoroa & Castellanos, Inc. on the same grounds. A separate opinion and order will be entered in adversary proceeding number 02–0004.

ment, and other indebtedness connected with the Contractor's Work for which the Owner or his property or the Owner or the Owners' surety might in any way be liable, have been paid or otherwise satisfied; (b) . . .; (c) . . .; and (d) other data if required by the Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by the Owner. Final payment shall constitute a waiver of all claims by the Contractor relating to the Contractor's Work, but shall in no way relieve the Contractor of liability for the obligations assumed under Article 9.10 hereof, or for faulty or defective work appearing after final payment.

The parties stipulated that the First and Second Contracts are exactly the same. Thus, reference to the provisions of the First Contract cited herein are applicable to the Second Contract.

On November 7, 2001, Caribbean filed for reorganization under Chapter 11 of the Bankruptcy Code. On January 9, 2002, Caribbean filed the instant adversary proceeding to collect moneys allegedly owed to the estate by defendant Coco Beach Utility. On April 10, 2002, the parties, Caribbean and Coco Beach Utility, filed a Joint Motion for Entry of Judgment ("Joint Motion") in the instant adversary proceeding, wherein the parties agreed on the amount owed by Coco Beach Utility to the debtor as final payment for the services rendered in the construction project, as well as the final amount owed to the laborers and suppliers under the Second Contract. The laborers and suppliers included in the Joint Motion are:

| | | |
|---|---|---|
| 1. | P.R. Precast Concrete | $15,256.98 |
| 2. | Comercial Adolfo S. Pagán, Inc. | 5,501.12 |
| 3. | Atlantic Lumber | 173.78 |
| 4. | CGS | 800.00 |
| 5. | Empresas Canales | 40.00 |
| 6. | Intaco | 150.00 |
| 7. | La Casa de los Tornillos | 72.00 |
| 8. | National Lumber & Hardware | 374.00 |
| 9. | P.R. Traction Tires | 399.10 |
| 10. | Ready Mix Concrete, Inc. | 288.00 |
| | Total | $23,105.85 |

According to the certificate of service of the Joint Motion, a copy of said motion was served upon the listed laborers and suppliers subject of the parties' agreement. The parties also agreed to consign with the Clerk of the Court, simultaneously with the filing of the Joint Motion, the amount of $23,105.85 corresponding to the suppliers' payment. The final payment for debtor's services would be deposited by Coco Beach Utility upon the court's approval of the Joint Motion.

P.R. Precast Concrete is the only supplier that has appeared in the instant adversary proceeding. P.R. Precast Concrete requests the release of the amount of $15,256.98 from the consigned funds for payment of the supplies and materials furnished to Caribbean for work performed under the contracts, on the ground that the funds consigned by Coco Beach Utility are to be used for payment of the suppliers.

On June 3, 2002, CASP filed a Motion to Lift Stay under Section 362 of the Bankruptcy Code. Debtor replied on June 21, 2002. A preliminary hearing was held on August 2, 2002, wherein the parties agreed to file legal briefs regarding the rights of CASP as to the moneys consigned by Coco Beach Utility with the Clerk of the Court as part of Coco Beach Utility's settlement with Caribbean in Adversary Proceeding No. 02–0003. On August 22, 2002, CASP filed a Motion Regarding Movants Right to Consigned Funds (Docket entry No. 72B), alleging that the amounts owed by debtor to CASP are not property of the estate, thus, the stay should be lifted under Section 362(d)(1) of the Bankruptcy Code, as the funds are earmarked for suppliers and materialmen. In addition, the following facts were stipulated by CASP and Caribbean:

1. Caribbean as the contractor, and Coco Beach Utility as the principal, entered into a construction contract for the installation of a sanitary sewer line.

2. The First Contract is a true and exact copy of the Second Contract.

3. Caribbean filed Adversary Proceeding No. 02–0003 against Coco Beach Utility to collect all moneys owed to Caribbean regarding the Second Contract.

4. Caribbean has completed all the work in the project for the installation of the sewer line, therefore, the amount claimed by Caribbean from Coco Beach Utility is the final disbursement of said project and does not comprise a progress payment.

5. The stipulation submitted by Caribbean and Coco Beach Utility on April 10, 2002 in the Adversary Proceeding No. 02–0003 acknowledges that CASP has a materialmen and supplier's claim in the amount of $5,501.12 against the retainage of the project for the installation of the sewer line.

6. CASP is owed the amount of $5,501.12 for materials provided to the project for the installation of the sewer line.

7. The parties agreed to waive all procedural requirements regarding this controversy and agreed to limit the issue as to what right, if any, CASP has to the funds deposited by Coco Beach Utility, or if they are part of the estate.

Debtor replied on October 3, 2002 objecting to the disbursement of the consigned funds and to the lifting of the automatic stay on behalf of CASP on the grounds that these funds are property of the estate. Caribbean alleges that CASP does not have a perfected security interest under Article 1489 of the Puerto Rico Civil Code over said funds, and that the payment owed by Coco Beach Utility to Caribbean is not the final payment but a progress payment (Docket entry No. 84B).

### Applicable Law and Discussion

A. *What is property of the estate under the Bankruptcy Code?*

■ Section 541(a)(1) of the Bankruptcy Code defines property of the estate. The estate is created as of the petition date, and "is comprised of all legal or equitable interests of the debtor in property," ... "wherever located and by whomever held." What is property of the estate within the scope of the broad definition of section 541(a)(1) is determined by federal and state law. "Federal law determines what is property for purposes of section 541(a)(1)," and "[a]pplicable state law determines whether an interest in property exists, however, and if so, the nature and scope of the rights associated with that interest." Lawrence Ponoroff, *Construction Claims in Bankruptcy: Making the Best of a Bad Situation,* 11 Bankr.Dev. J. 343, 374 (1995). "Once it is established that, under applicable nonbankruptcy law, the debtor has a legal or equitable interest in property as of the petition date, the question of whether that interest is estate property is strictly a question of bankruptcy law." 1 Robert E. Ginsberg and Robert D. Martin, *Ginsberg & Martin On Bankruptcy* § 5.01[B][2], Fourth Edition (2003).[2] In a recent First Circuit opinion, *City of Springfield, Massachusetts v. Os-*

---

**2.** For example, when the property is held by a third party, then the debtor or the trustee may apply the following test to determine whether said property is property of the estate, and as such, it should be turned over to the debtor's estate: "If the trustee can use, sell, or lease the property or if the debtor could claim the property as exempt, then the third party can be required to deliver that property to the trustee or the debtor, or to account to the estate for its value." *Ginsberg,* § 5.04[A]. Thus, the property subject of the turnover "must not be of inconsequential value or benefit to the estate." *Id.*

trander, et al. (In re LAN Tamers, Inc.), 329 F.3d 204 (1st Cir.2003), the court held that "[p]roperty interests are created and defined by state law. *Unless some federal interest requires a different result*, there is no reason why such interests should be analyzed differently [in bankruptcy law]." (Citations omitted). 329 F.3d at 213. The *LAN Tamers* court also held that "[s]ection 541 eliminates exclusive reliance on state law in determining what constitutes property of the estate but recognizes the traditional role of the states in creating and defining the underlying property interests and commercial arrangements to which bankruptcy law applies." 329 F.3d at 214. If there is a federal interest involved, then state law may yield to the application of federal law.

■ Generally, courts refer to state law to determine whether the moneys paid to the contractor under the construction contract is property of the estate, when the workers and materialmen have not been paid by the contractor.

> Where a debtor-contractor who has received moneys on contracts for which the workers and materialmen are unpaid, state law will determine whether the contractor holds the assets as trustee. If so, they may technically be assets of the estate, but Section 541(d) limits the estate's ownership interest to bare legal title. A debtor may not use the assets for other purposes than to pay the workers and materialmen. 2 Daniel R. Cowans, *Bankruptcy Law And Practice* 2 Daniel R. Cowans, *Bankruptcy Law And Practice* § 9.2, Seventh Edition (2002), Seventh Edition (2002).

Likewise, "[w]here a general contractor deposited money in an account in the name of the subcontractor for creditors of that subcontractor, the money was not an asset of the estate of the subcontractor." Cowans, § 9.2(h).

■ In the instant case, the Second Contract entered into by Caribbean and the principal Coco Beach Utility specifically provides that Coco Beach Utility will hold a retainage of ten percent to be released upon Coco Beach Utility's acceptance of the work performed. The Second Contract also provides that final payment to Caribbean is subject to Caribbean's presentation of an affidavit evidencing that all payments corresponding to "payrolls, bills for materials and equipment, and other indebtedness connected with the Contractor's Work for which the Owner or his property or the Owner or the Owners surety might in any way be liable, have been paid or otherwise satisfied."

The parties agreed that Caribbean had completed the construction work under both contracts prior to bankruptcy. It is also uncontested that the suppliers listed in the Joint Motion have not been paid by Caribbean, notwithstanding Caribbean's contractual obligation to pay the workers and suppliers before requesting the final payment from Coco Beach Utility. The parties also stipulated that Caribbean filed the instant adversary proceeding against Coco Beach Utility to collect the amount owed for work performed under the Second Contract, as a final payment and not as a progress payment. As agreed by Caribbean and Coco Beach Utility in the Joint Motion, Coco Beach Utility consigned with the Clerk of the Court the amount corresponding to the payment to the laborers and suppliers in compliance with Puerto Rico law, and to avoid the possibility of double liability. Caribbean alleges that the consigned funds are property of the estate (Docket entry No. 84B). We disagree.

■ The First Circuit has addressed the issue of unpaid suppliers that have

performed under a construction contract within the scope of the definition of property of the estate both under the Bankruptcy Act and the Bankruptcy Code. The First Circuit has ruled that "the payment of previously unpaid laborers and materialmen is a cost of completing a contract." *Framingham Trust Company v. Gould–National Batteries, Inc., et al.,* 427 F.2d 856, 859 (1st Cir.1970). In *Segovia Development Corporation v. Constructora Maza, Inc.,* 628 F.2d 724 (1st Cir.1980), the court also held that "contract retainages do not become the property of a contractor until contractual obligations such as payment of the laborers and materialmen are met." 628 F.2d at 728. Consequently, under *Segovia,* the contract retainages do not become property of the estate until the contractual obligations, such as payment to the suppliers and materialmen are complied with fully.

■ Under Puerto Rico law, the "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." Article 1044 of the Puerto Rico Civil Code, 31 L.P.R.A. § 2994. Thus, failure to pay the laborers and materialmen under the contract constitutes a breach of contract by the contractor under Puerto Rico law. The Second Contract provides that Caribbean has (a) to pay the laborers and materialmen before requesting the final payment from Coco Beach Utility; and (b) to present evidence of said payments through an affidavit. It is uncontested that Caribbean has failed to comply with both contractual requirements, at least as to some suppliers, ac-

cording to the parties' stipulated facts mentioned above. Under Puerto Rico law, failure to comply with the terms and conditions of a contract constitutes a breach of contract. 31 L.P.R.A. § 2994.

■ In the instant case, both the construction contracts, and the construction work were executed and performed in Puerto Rico by private parties under nonpublic contracts. According to the terms of the Second Contract, the construction project is not subject to a federal grant or a federal program. Thus, they are governed by Puerto Rico law. The court in *Segovia* held that a contractor "did not acquire rights in the retainages until it paid the laborers, materialmen, and subcontractors, and performed its agreement" with the owner of the construction project. 628 F.2d at 727. Under Puerto Rico law, the laborers, suppliers and materialmen who work for a contractor may sue the owner of the construction project through a "direct action" for any amount owed by the owner to the contractor at the time that the action is filed. Article 1489 of the Puerto Rico Civil Code, 31 L.P.R.A. § 4130.[3] *See also Segovia,* 628 F.2d at 728. Absent a federal interest, then Puerto Rico law "is controlling when determining the debtor's interest in property." *Gray v. The Travelers Insurance Company (In re Neponset River Paper Company),* 231 B.R. 829, 832 (1st Cir. BAP 1999). Hence, the retained funds are property of the owner, and not property of the estate. *First Indemnity of America Insurance Company v. Modular Structures, Inc. (In re Modular Structures, Inc.),* 27 F.3d 72, 77–78 (3rd Cir.1994).[4]

---

3.  Article 1489 of the Puerto Rico Civil Code, 31 L.P.R.A. § 4130, provides:

    Those who furnish their labor and materials in a work agreed upon for a lump sum by a contractor have no action against the own-

er, except for the amount the latter may owe the former when the action is brought.

4.  Caribbean argues that the consigned funds are property of the estate because the suppliers do not have a perfected security interest on their claims. In *Aníbal L. Arsuaga, Inc. v.*

B. *The Earmarking Doctrine.*

■ The earmarking doctrine is recognized by the First Circuit, as a "court-made interpretation of the statutory requirement that a voidable transfer must involve a 'transfer of an interest of the debtor in property.'" *Neponset*, 231 B.R. at 834, citing *Kapela v. Newman*, 649 F.2d 887, 892 (1st Cir.1981). The court, citing *Titan Energy Corporation v. Central Oilfield Supply Co. Of Logan, Ohio (In re Titan Energy Corp.)*, 82 B.R. 907, 909 (Bankr.S.D.Ohio 1988), held that, "if the funds from a third party are specifically designated for transfer to a particular creditor and the debtor is either a mere conduit or uninvolved in the transfer, the funds are specifically said to be 'earmarked.'" 231 B.R. at 834. *Neponset* also held:

> For earmarking to apply, the participation of three parties is required: the creditor who received the payment, a new creditor who provided funds to pay the original creditor, and the debtor. (Citations omitted). Cornerstones of this doctrine are: (1) the absence of control by the debtor over the disposition of the funds, and (2) no diminution of the debtor's estate as a result of the transfer. (Citations omitted).
>
> . . .
>
> Factors to be considered when determining whether a transfer satisfies the earmarking doctrine are: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and

(3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in the diminution of the estate." (Citations omitted).
231 B.R. at 834–835. In sum, to determine the applicability of the earmarking doctrine, the court will examine what control, if any, the debtor has over the disposition of funds, and whether the transfer of funds results in the diminution of debtor's estate. *Id.*

■ In the instant case, CASP argued that it is entitled to payment from the consigned funds under the earmarking doctrine. We agree that CASP is entitled to payment from the consigned funds, but not under the earmarking doctrine.

The earmarking doctrine is inapplicable to the case at bar for the reasons that follow. In the instant case, there is no transfer involved by a third party during the preference period. The funds have been deposited by the owner of the construction project Coco Beach Utility in compliance with applicable Puerto Rico law to avoid the possibility of double liability. As stated above, the payment to the suppliers is governed by Article 1489 of the Puerto Rico Civil Code, 31 L.P.R.A. § 4130. The consignment of the funds does not meet the criteria required by the earmarking doctrine, insofar as Caribbean does not have any control over the funds deposited by Coco Beach Utility. Under Puerto Rico law, the suppliers have the right to collect directly from the owner of the construction project when the contractor defaults under the construction con-

---

*La Hood Constructors, Inc., et al.*, 90 D.P.R. 104, 117, 90 P.R.R. 101, 113, 1964 WL 14359 (1964), the Puerto Rico Supreme Court held that "in our jurisdiction by law there is no materialmen lien." The rights of the laborers, suppliers and materialmen are protected by Article 1489 of the Puerto Rico Civil Code,

31 L.P.R.A. § 4130. Thus, the suppliers do not have to perfect a security interest on their claims. However, whether the suppliers hold or not a perfected security interest does not alter the ultimate result, which is that the consigned funds are not property of the estate.

tract. Thus, the distribution of the consigned funds designated for payment to the laborers and suppliers will not result in a diminution of Caribbean's estate because said funds are not property of the estate. Lastly, a new debt is not created as a result of the payment of an antecedent debt [to the laborers and suppliers], since the party consigning the funds is not a new creditor but the same party that contracted with Caribbean. Thus, the requirement of the participation of three parties (the original creditor, the new creditor, and the debtor) is not met, which makes the earmarking doctrine inapplicable to the instant case.

### C. *A progress or a final payment, does it matter?*

Prior to the enactment of the Bankruptcy Code in 1978, the Supreme Court of the United States entertained the issue of who has the property rights to a fund withheld by the Government from earnings due to a contractor in *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The Court held:

> Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another. Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors....
>
> This Court has recently reaffirmed that such property rights existing before bankruptcy in persons other than the bankrupt must be recognized and re-

spected in bankruptcy. Consequently, our question is not who was entitled to priority in distributions under s 64, but whether the surety had, as it claimed, ownership of, and equitable lien on, or a prior right to this fund before bankruptcy adjudication.

. . .

> [T]he Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

371 U.S. at 135–136, 141, 83 S.Ct. 232.

Debtor's counsel argues that the *Pearlman* decision is inapplicable to the cases that arise under the Bankruptcy Code because *Pearlman* was rendered under the Bankruptcy Act, and the Code has broadened the definition of property of the estate. Another argument raised by counsel is that *Pearlman* only applies when the principal or the owner in a construction contract is the Government. We disagree with both arguments. For the reasons that follow, we adopt the analysis made by the Third Circuit in *Modular*, 27 F.3d 72, 77, citing the analysis made by the First Circuit in *Framingham*, 427 F.2d 856.

The *Modular* and *Framingham* courts agree that the *Pearlman* ruling is applicable to any owner regardless of whether it is a governmental or a non-governmental entity, because the issue is one of payment to the unpaid laborers and suppliers that have performed under a construction contract. Regardless of whom the owner is, that is, whether it is a public or a private contract, the fact remains that the con-

struction contract must be completed and the laborers and suppliers that have performed under the contract must be paid. In *Framingham,* the court held:

> The government's well established right to have the laborers and materialmen paid out of the unpaid progress payments or unpaid balance does not arise from any legal obligation to such suppliers but simply from its equitable obligation to those who provide it with labor and materials. (Citations omitted). We see no reason why that same equitable obligation to the laborers and materialmen should not exist on the part of the non-government owner, who receives the same benefit from those suppliers—construction work and materials—as did the government in the aforementioned cases. Moreover, the non-government owner, like the government, has an interest in seeing its suppliers paid so that the work necessary for completion of the contract can be done with minimum disruption and expense. . . .
>
> Therefore, since both the government and the non-government owner have the right to pay their suppliers out of the unpaid balance, the performing surety, through subrogation, is entitled to assert that right, and prevail over the secured creditor. . . . In sum, we cannot escape the conclusion that in both a practical and a legal sense, the payment of previously unpaid laborers and materialmen is a cost of completing the contract.

427 F.2d at 858–859.

The *Modular* court, a case decided under the Bankruptcy Code, expands the scope of the analysis made by the First Circuit in *Framingham,* and holds that, notwithstanding the differences between the Code's and the Act's definition of property of the estate, the *Pearlman* ruling has survived the "first wave of decisions under the Code with respect of sureties' rights, and through early 1985, it could be said rather confidently that *Pearlman* had weathered such assaults as the Code made available against it." 27 F.3d at 78, citing J. Michael Franks and Michael E. Evans, *A Defense of Established Landmarks: Claims of Construction Sureties to Contract Funds Under Chapter 11,* 25 Tort & Ins.L.J. 28 (1989). In *Modular,* the court held that because Modular had not paid the subcontractors under the terms of the contract, the principal did not owe any moneys to Modular. "If the subcontractors had been paid and the monies held by the Salvation Army were in fact owed to Modular, the *Pearlman* doctrine would not then be applicable." 27 F.3d at 79. The court also reaffirmed that the *Pearlman* doctrine is applicable to public and private contracts. *Id.*

■ In the instant case, both construction contracts were executed by private parties, thus, they are private contracts. It is uncontested that the contractor Caribbean has breached the terms of both construction contracts, because it has failed to pay its suppliers under the contracts. It is also uncontested that, although there are no sureties involved in this case, the equitable principle of unjust enrichment is applicable under both the *Pearlman* doctrine and Puerto Rico law,[5] to avoid the possibility of double liability

---

5. Article 1207 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3372, provides:

> The contracting parties may take the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order.

Article 1227 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3432, provides:

> Contracts without consideration or with an illicit one have no effect whatsoever. A consideration is illicit when it is contrary to law and good morals.

by the owner. *See Pearlman,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190; *Framingham,* 427 F.2d 856; *Modular,* 27 F.3d 72; *Segovia,* 628 F.2d 724.

In sum, it really does not matter whether the payment to the suppliers originates from a progress or a final payment, because this determination will not alter the outcome of our ruling. The crux of the matter is that the suppliers have not been paid by Caribbean under the stipulated terms of the construction contracts. Caribbean's failure to comply with the terms of the contracts constitutes a breach of contractual obligations under Puerto Rico law. Thus, the moneys retained by the principal Coco Beach Utility for the payment of the unpaid suppliers are not property of the estate, pursuant to the Code's definition of property of the estate. *See Pearlman,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190; *Framingham,* 427 F.2d 856; *Modular,* 27 F.3d 72; *Segovia,* 628 F.2d 724.

### *Conclusion*

For the reasons stated above, we find that the retainage held by Coco Beach Utility under the Second Contract is not property of the estate under section 541(a)(1) of the Bankruptcy Code until the laborers and suppliers are paid in full according to the terms and conditions set forth in the Second Contract. Therefore, the moneys consigned by Coco Beach Utility in the instant adversary proceedings for the payment of laborers and suppliers are not property of the estate.

In view of the fact that Coco Beach Utility has consigned the agreed amount to pay the laborers and suppliers in compliance with Puerto Rico law, the court finds that Coco Beach Utility be and hereby is released and discharged of any liability as to the payment of the suppliers and materialmen included in the instant adversary proceeding and to avoid any direct action

against Coco Beach Utility by the suppliers for any unpaid amounts.

The Clerk shall disburse the amount of $15,256.98 to P.R. Precast Concrete and the amount of $5,501.12 to Comercial Adolfo S. Pagán, Inc.

The Clerk shall also disburse the balance of the amounts consigned to each of the suppliers, at their address of record.

The Clerk shall enter judgement accordingly.

SO ORDERED.