In re NEPONSET RIVER PAPER COMPANY, f/k/a Patriot Paper Corporation, Debtor.

Stephen S. Gray, Trustee,
Plaintiff/Appellee,

v.

The Travelers Insurance Company,
Defendant/Appellant.

BAP No. MB 97–085.

United States Bankruptcy Appellate Panel of the First Circuit.

March 12, 1999.

Garrett Harris, Gallagher & Gallagher, P.C., Boston, MA, on brief, for appellant.

Harold B. Murphy, D. Ethan Jeffery, Hanify & King, Boston, MA, on brief, for appellee.

Before GOODMAN, LAMOUTTE and DE JESÚS, U.S. Bankruptcy Judges.

LAMOUTTE, Bankruptcy Judge.

Before the panel is an appeal from the decision of the bankruptcy court avoiding a pre-petition payment to The Travelers Insurance Company ("Travelers") for the payment of worker's compensation insurance premiums. The bankruptcy court found that this payment was a preferential transfer pursuant to 11 U.S.C. § 547(b).

Of note is a prior decision by the bankruptcy appellate panel involving this same debtor and nearly identical facts: *In re Neponset River Paper Company, f/k/a/ Patriot Paper Corporation (Stephen S. Gray v. Camp Dresser & McKee, Inc.)*, BAP No. 97–006, February 25, 1998. The panel therein affirmed the decision of the bankruptcy court which avoided a transfer to Camp, Dresser & McKee, Inc., made under the same circumstances as the transfer at issue in the case before this panel.

For the reasons set forth below, the decision of the bankruptcy court is affirmed.

### Jurisdiction and Standard of Review

The bankruptcy appellate panel has jurisdiction over this appeal pursuant to 28 U.S.C. § 158. Findings of fact made by a bankruptcy court may not be set aside unless clearly erroneous, giving due regard to the bankruptcy court's determination of credibility of witnesses and the weight accorded the testimony. Fed.R.Bankr.P. 8013; *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir.1997); *see generally* 19 James Wm. Moore, *Moore's Federal Practice* § 206.03 (3rd ed.1997). Although supported by evidence, a finding is clearly erroneous when, after careful review, the reviewing court is left with the definite

impression that a mistake has been made. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Where two views of the evidence are plausible, the trial court's preference cannot be clearly erroneous and may not be disturbed even where the appellate court would have held otherwise. *Williams v. Poulos*, 11 F.3d 271, 278 (1st Cir.1993).

The clearly erroneous standard also applies to mixed questions of law and fact, except where the court's disposition is based upon mistaken legal principles, making the *de novo* standard applicable. *Williams*, 11 F.3d at 278. Conclusions of law are reviewed *de novo*, with no special deference to the bankruptcy court's determinations. *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir.1994); *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991).

### Background

*Facts*

Debtor Neponset River Paper Company, formerly known as the Patriot Paper Corporation, was the owner and operator of a paper mill in Hyde Park, Massachusetts. Ninety-one percent of debtor's stock was owned by Invescorp, Inc., a wholly-owned American subsidiary of the Canadian corporation Tembec, Inc. Pierre Monahan was the CEO of the debtor, and was also the president of Invescorp and a senior vice-president of Tembec. Susan Kalitsis was the debtor's controller. James Manzi and his law firm, Varet, Marcus & Fink (VM & F), were the debtor's attorneys up until the time the petition was filed. Manzi also represented Tembec and Invescorp. The Travelers Insurance Company is a Connecticut corporation which, beginning in August, 1991, provided the debtor with worker's compensation insurance.

In 1990–1991, debtor began constructing a de-inking facility and related waste water treatment facility at its paper mill. Financing for the project was provided by a $37.4 million Massachusetts Industrial Revenue Bond backed by a letter of credit from the National Westminister Bank (NatWest), which also extended debtor a $7.5 million line of credit. By December, 1992, debtor had run out of funds and sought additional funds from NatWest. On December 3, 1992, Nat-West issued a written commitment to provide debtor with $6.6 million in additional financing, on the condition that Tembec or Invescorp make an equity contribution to debtor. Accordingly, on December 8, 1992, the debtor and Invescorp entered into a Working Capital Agreement whereby Invescorp agreed to make loans to debtor totaling $4 million. The Working Capital Agreement contained a provision establishing an operating account into which funds were deposited, and provided that the amount and use of each working capital loan was subject to the prior approval of Invescorp.

Between December 14, 1992, and January 25, 1993, Invescorp made ten transfers to the debtor from the operating account totaling $2,743,000.00. Prior to these advances, Kalitsis would inform Monahan of the amount of funds that the debtor needed, sometimes specifying particular creditors to be paid and other times merely describing general categories of expenditures, and the funds were immediately wired to debtor.

After the second week of January, 1993, the debtor ceased all manufacturing operations and laid off all of its manufacturing employees. On Wednesday, January 27, 1993, debtor met with NatWest, at which time NatWest rejected debtor's request for funding and informed it that it intended to declare a default under the existing loan if debtor did not make an interest payment due on February 1, 1993. On January 28, 1993, the balance of the funds under the Working Capital Agreement was transferred from the debtor's operating account to VM & F's clients' funds account. A day later, on January 29, 1993, Monahan wrote a letter to VM & F instructing Manzi to hold the funds as an agent of Invescorp.

On February 1, 1993, a meeting was held to discuss the use of the $1,257,000.00 remaining under the Working Capital Agreement, which had already been transferred to the VM & F account. In advance of that meeting, Kalitsis prepared a list of the creditors to be paid in order for Debtor to restart its paper mill, including Travelers, to avoid cancellation of its worker's compensation pol-

icy. On that same date, NatWest issued a notice of default under the debtor's loan to Invescorp and the debtor. The next day, on February 2, Kalitsis faxed a letter to VM & F directing the issuance of checks to various creditors, including Travelers. VM & F issued the checks and sent them to Kalitsis, who in turn mailed the checks, including Travelers in the amount of $204,359.00.

*Procedure*

Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on March 17, 1993. On May 17, 1994, the case was converted to one under chapter 7 and a trustee was subsequently appointed. The trustee commenced an adversary proceeding against the Travelers Insurance Company on June 27, 1995, seeking to avoid and recover a transfer of funds pursuant to 11 U.S.C. §§ 547 and 550, from debtor's attorney to Travelers which occurred on February 2, 1993. Travelers disputed whether the payment was a transfer of debtor's property, and also raised affirmative defenses under § 547(c)(1), (c)(2) and (c)(4).

The parties stipulated that the transfer satisfied every element of a preferential transfer under § 547(b) except for the requirement that it constituted a transfer of interest in the debtor's property. They further stipulated that Travelers provided "new value" under § 547(c)(4), and that none of the remaining defenses under § 547 were applicable.

A hearing was held on October 16, 1997, at which the court heard testimony from Susan Kalitsis, the debtor's former controller, and James Manzi, the debtor's former attorney. The court ruled that the February 2, 1993 payment to Travelers was an avoidable preference under § 547(b).[1] The court so held, even though the funds from which the payments were made were part of the proceeds of a working capital loan from Invescorp to the debtor being held by VM & F in a clients' funds account, because the judge found that debtor exercised sufficient control over the funds for them to constitute property of the estate. The court entered judgment on October 16, 1998, in favor of the trustee in the amount of $192,359.00. On October 21, 1997, Travelers filed a notice of appeal.

On October 23, 1997, the trustee filed a motion to amend the judgment to add prejudgment interest, which was granted by the bankruptcy court on January 5, 1998. On January 12, 1998, Travelers filed an amended notice of appeal.

### Discussion

*Avoidable Preference*

The Bankruptcy Code provides for avoidance of preferential transfers to insure orderly and fair distribution of assets, and to prevent pre-petition dismantling of the debtor's estate. 11 U.S.C. § 547; *e.g. In re Bohlen Enters., Ltd.,* 859 F.2d 561, 566 n. 10 (8th Cir.1988). A transfer is avoidable where the debtor's interest in property was transferred to or for the benefit of a creditor, for or on account of an antecedent debt, while the debtor was insolvent or on or within 90 days before the date of filing bankruptcy, and such transfer enables the creditor to receive more than it would in a chapter 7 liquidation. 11 U.S.C. § 547(b); *In re Ralar Distribs., Inc.,* 4 F.3d 62, 65 (1st Cir.1993); *In re Smith,* 966 F.2d 1527, 1530 (7th Cir.), *cert. dismissed,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992).

At issue is whether the funds transferred to Travelers are property of the estate. Property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case,"[2] and absent federal authority, state law is controlling when determining the debtor's interest in property. *Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *Ralar,* 4 F.3d at 67; *Smith,* 966 F.2d at 1530; *see also In re Kemp Pacific Fisheries, Inc.,* 16 F.3d 313, 315 (9th Cir.1994).

---

**1.** This finding is consistent with its decision in the previous preference action in this bankruptcy proceeding, wherein the bankruptcy judge found that the monies paid to Camp, Dresser & McKee constituted a transfer of an interest of the debtor in property which was an avoidable preference under § 547(b).

**2.** 11 U.S.C. § 541(a)(1).

The main inquiry in determining whether an alleged preference involved an "interest of the debtor in property" is whether the property transferred would have been part of the bankruptcy estate had it not been transferred before the petition date. 5 Lawrence P. King, et al., *Collier on Bankruptcy* ¶ 547.03[2], pp. 547–20 – 547–27 (15th ed. rev.1996); *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); *Ralar*, 4 F.3d at 67; *In re Bank of New England Corp.*, 165 B.R. 972, 977 (Bankr.D.Mass. 1994). The transfer must diminish the fund to which other creditors can legally resort for payment. *Collier* at 547–23. Also, the ability to exercise control over the property is sufficient to establish ownership. *Kemp*, 16 F.3d at 316 ("[d]iminution of the estate doctrine" looks to debtor's control over the transferred property to determine ownership); *see also Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1358 (5th Cir.1986) (the value of an asset belongs to the person who controls it).

The transfer at issue herein was made from funds held by the debtor's attorneys. The general rule is that money held by a debtor's attorney is property of the bankruptcy estate. *In re Rothwell*, 159 B.R. 374, 380 (Bankr.D.Mass.1993) (settlement proceeds held by law firm on behalf of debtor belonged to bankruptcy estate and were subject to turnover); *In re Winters*, 182 B.R. 26, 28 (Bankr.E.D.Ky.1995) (funds held in debtor's counsel's "escrow" account were property of the estate). Furthermore, Massachusetts law provides that property of a client may be held by a law firm but, upon request, must be returned. Mass. S.J.C. Rule 3:07, DR 9–102(B)(4); *see also Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 973 (1st Cir.1993) (holding that when a law firm functions as a custodian, the property remains part of the debtor's estate); *In re U.S.A. Diversified Prods., Inc.*, 196 B.R. 801, 805–807 (N.D.Ind.), *aff'd*, 100 F.3d 53 (7th Cir.1996); *Miller v. Kibler (In re Winters)*, 182 B.R. 26, 28 (Bankr.E.D.Ky. 1995).

At trial, Susan Kalitsis, the debtor's controller, and Jim Manzi, who at various times relevant to this proceeding served as counsel for the debtor, Invescorp and Tembec, testified as to the disposition of the funds deposited with VM & F. Based upon the evidence before her, the bankruptcy judge made the following findings, which are unchallenged: 1) the check issued to Travelers came out of the $1,257,000 which was the proceeds of a working capital loan from Invescorp to debtor and was deposited in the VM & F clients' fund account; 2) Susan Kalitsis authorized VM & F to issue the check to Travelers in payment of the workers' compensation premium; 3) the only purpose of the VM & F account was to keep NatWest from seizing the money that Invescorp had advanced to the debtor; otherwise, the funds would have been deposited directly into debtor's account; 4) VM & F acted as debtor's attorneys and was paid by debtor, while Manzi represented Invescorp and Tembec as well; 5) although Monahan, who served as debtor's CEO, was also the president of Invescorp and senior vice-president of Tembec, and approved Kalitsis' decisions to pay certain creditors, there is no evidence that Invescorp or Tembec even exercised any control over the disposition of the funds in the VM & F clients' fund account; 6) the funds in the VM & F account were property of the debtor's estate. Appendix 159–162.

Travelers argues that the bankruptcy court erred in finding that the payment made to it constituted a transfer of an interest of the debtor in property. First, it argues that the money used to make the payment belonged to a third party—Invescorp, Inc.—which issued the payment on debtor's behalf pursuant to the working capital agreement, and that therefore the transfer at issue does not constitute a "transfer of an interest of the debtor in property" under § 547(b). It points out that the original $4 million was an *investment* by Tembec in Invescorp, not a gift or loan to Patriot. Further, it argues that Patriot did not have access to the funds without Invescorp's authorization.

However, the evidence before the bankruptcy court showed that Patriot did have an interest in the funds transferred by Invescorp to VM & F's clients' fund account. At the time of the transfer, VM & F represented Patriot, and it was Patriot who paid VM &

F's legal fees. Appendix 107, 137. The funds which were transferred constituted the remaining balance under the working capital agreement and was accounted for on debtor's financial statement as a liability to Invescorp Appendix, p. 141.

Second, Travelers argues that the transfer at issue cannot be considered a "transfer of an interest of the debtor in property" because the debtor had no control over the money. It points out that Invescorp and Tembec exercised control over the disbursement of the monies by requiring Patriot identity the purpose of its requested disbursements. Even when the remaining funds were transferred to the VM & F account, it argues, Kalitsis still had to consult with Monahan and Manzi and submit written requests for checks; she had no authority to disburse funds from the account without doing so. Furthermore, Travelers argues, Invescorp had explicitly instructed VM & F to hold the funds as its agent.

However, the evidence before the bankruptcy court demonstrated that it was the debtor, not Tembec or Invescorp, which exercised control over the funds under the working capital agreement as well as those in the VM & F clients' funds account. Kalitsis would determine the amount of funds needed under the working capital agreement. Appendix, p. 125. Further, the list of creditors who received disbursements from the funds was made by Kalitsis, who worked exclusively for the debtor, and was paid without question. Appendix, pp. 125–127. Furthermore, it was Kalitsis who prepared the schedule of creditors to be paid from the funds transferred to the VM & F account. Appendix 132–135.

Finally, the transfer of the funds from the working capital account to the VM & F clients' funds account, in order to avoid NatWest taking control of the funds upon the filing of Patriot's bankruptcy petition, ensured that the debtor would have use of the funds and indicates that, rather than controlling the funds, Invescorp had irrevocably committed the remaining funds under the working capital agreement to the debtor. The evidence shows that Patriot controlled the disbursement of the funds under the working capital agreement and, later, from the VM & F clients' funds account.

*Earmarking Doctrine*

■ Earmarking, recognized by the First Circuit in *Kapela v. Newman*, 649 F.2d 887, 892 (1st Cir.1981), is "entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property.'" *Bohlen*, 859 F.2d at 565. The doctrine defeats the equitable considerations of the preference statute, and first arose in instances where a third-party guarantor paid a creditor during the preference period and which, if avoided, would result in double payment of the debt by the guarantor. *See, e.g. Nat'l Bank of Newport v. Nat'l Herkimer County Bank*, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912); *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2nd Cir. 1938).

> According to this doctrine, "under certain circumstances, a transfer from a third party to a creditor of the debtor is not avoidable as a preference." *Titan Energy Corporation v. Central Oilfield Supply Co. of Logan, Ohio (In re Titan Energy Corp.)*, 82 B.R. 907, 909 (Bankr.S.D.Ohio 1988). "[W]here the only change is in the identity of the creditor, without a corresponding depletion of the bankruptcy estate, one policy underlying the power to avoid a preference has not been offended by the transfer." *Id.* For instance, "[i]f funds from a third party are specifically designated for transfer to a particular creditor and the debtor is either a mere conduit or uninvolved in the transfer, the funds are specifically said to be 'earmarked'." *Id.* at 909.

*Geremia v. Fordson Assoc. (In re International Club Enters., Inc.)*, 109 B.R. 562, 566 (Bankr.D.R.I.1990).

■ For earmarking to apply, the participation of three parties is required: the creditor who received the payment, a new creditor who provided funds to pay the original creditor, and the debtor. *Bohlen*, 859 F.2d at 565; *see also In re Kelton Motors, Inc.*, 97 F.3d 22, 28 (2nd Cir.1996); *Smith*, 966 F.2d at 1533. Cornerstones of this doctrine are: (1) the absence of control by the

debtor over the disposition of the funds, and (2) no diminution of the debtor's estate as a result of the transfer. *Kemp,* 16 F.3d at 316; *Smith,* 966 F.2d at 1533. The use of earmarked funds to pay an existing creditor simply results in a new debt replacing an old debt, and the fund available for debtor's general creditors remains unchanged. *Bohlen,* 859 F.2d at 565. Some courts have refused to extend this doctrine to situations where the money transferred to the old creditor was not based upon a guarantee or similar obligation. *See International Club,* 109 B.R. at 566–67.

■ Factors to be considered when determining whether a transfer satisfies the earmarking doctrine are: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate." *Bohlen,* 859 F.2d at 566 (footnote omitted).

■ In rejecting the application of the earmarking doctrine, the bankruptcy court noted that the factual question is typically whether the debtor has control over the disposition of the funds, and found that the debtor exercised such control through the actions of Kalitsis, who had authority to determine who should be paid from the VM & F account. Appendix, pp. 160–162. This control by the debtor of the distribution of the funds precludes the application of the earmarking doctrine herein.

■ Additionally, the transfer clearly diminished the debtor's estate. Diminution of the estate occurs where the transfer reduces the pool of funds available to all, so that creditors in the same class do not receive as great a percentage as the preferred creditor. *Kemp,* 16 F.3d at 316; *Mandross v. Peoples Banking Co. (In re Hartley),* 825 F.2d 1067, 1070 (6th Cir.1987). The funds transferred to VM & F's clients' account were disbursed by Kalitsis to several of the debtor's creditors who she determined needed to be paid in order to start up debtor's operation. Appendix, p. 133. Accordingly, but for the transfer and distribution of the funds in question, they would have been available for distribution to other creditors.

The panel agrees with the bankruptcy court that the earmarking doctrine does not apply in this case for several reasons. First of all, the funds at issue were not furnished by a guarantor of Patriot's obligation to Travelers. *Bohlen,* 859 F.2d at 566 (where there is no guarantor, the earmarking doctrine does not help either the new creditor or the debtor.) Neither Invescorp nor Tembec guaranteed the debtor's obligation to Travelers. Furthermore, the requirement for the application of the earmarking doctrine are not present in the case before the panel. First, there is no evidence of an agreement between Invescorp and Patriot regarding the use of the funds under the Working Capital Agreement or the funds transferred to the VM & F account. *See, e.g. In re A.J. Lane,* 164 B.R. 409, 418 (Bankr.D.Mass.1994); *In re Bank of New England Corp.,* 165 B.R. 972, 977 (Bankr.D.Mass.1994). Further, Patriot controlled the disposition of the funds, and therefore the transfer to Travelers did result in a diminuation of the debtor's estate. If Patriot had not made the payment at issue, the funds would have been an asset of the debtor's bankruptcy estate and available for payment to other creditors.

*Pre-judgment Interest*

■ Travelers argues that the bankruptcy court erred in awarding pre- and post-judgment interest to the trustee. It alleges that the prevailing plaintiff in a preference action is only entitled to prejudgment interest when the amount of the claim is either "liquidated" or "reasonably ascertainable by reference to established market values." *Robinson v. Watts Detective Agency,* 685 F.2d 729, 741 (1st Cir.1982) ("the court's prejudgment inquiry is reducible to whether the demand is of such a nature that its exact pecuniary amount was either ascertained, or ascertainable by simple computation, or by reference to generally recognized standards such as market price."). According to Travelers, because of the pendency of the "new value" defense to the preference action, the

amount of its claim was neither liquidated nor reasonably ascertainable. Therefore, Travelers argues, the award of pre-judgment interest unfairly penalizes it and, if awarded at all, should be limited to as of the date of the stipulation regarding the amount of the claim.

The trustee agrees with the standard for awarding pre-judgment interest, but argues that the general rule is that courts award interest from the time the demand is made or the adversary proceeding instituted, citing *In re Investment Bankers*, 4 F.3d 1556, 1566 (10th Cir.1993). In the alternative, the trustee argues that the claim was liquidated because the amount of the transfer was known and the potential amount of new value was easily determined and readily ascertainable.

The bankruptcy court wrote a well-reasoned memorandum of decision setting forth its reasons for granting the trustee's motion to amend judgment[3], and the panel has not been persuaded that it's decision was in error or should be set aside. As stated by the First Circuit, "We have long proclaimed that when a lower court produces a comprehensive, well-reasoned decision, an appellate court should refrain from writing at length to no other end than to hear its own words resonate." *Frances–Colon v. Ramirez*, 107 F.3d 62 (1st Cir.1997), citing *Lawton v. State Mut. Life Assurance Co.*, 101 F.3d 218, 220 (1st Cir.1996). Accordingly, the bankruptcy court's award of interest on the preference claim is affirmed for the same reasoning.

### Conclusion

The panel affirms the decision of the bankruptcy court to avoid the payment to Travelers because it found that it was a preferential transfer under 11 U.S.C. § 547(b), and to award pre- and post-judgment interest on the claim, is not in error and is therefore affirmed.

SO ORDERED.