The FREAKY BEAN COFFEE COMPANY, Debtor.

William A. Howison, Chapter 7 Trustee, Plaintiff–Appellee,

v.

Milo Enterprises, Inc., Defendant–Appellant.

BAP No. EP 12–082.
Bankruptcy No. 09–20211–JBH.
Adversary No. 10–02019–JBH.

United States Bankruptcy Appellate Panel of the First Circuit.

Aug. 2, 2013.

772

George J. Marcus, Esq., and David C. Johnson, Esq., on brief, Portland, ME, for Appellant.

Timothy H. Norton, Esq., on brief, Portland, ME, for Appellee.

Before BOROFF, DEASY, and TESTER, United States Bankruptcy Appellate Panel Judges.

BOROFF, Bankruptcy Judge.

Milo Enterprises, Inc ("Milo") appeals from the following bankruptcy court orders: (1) the June 9, 2011 order denying its motion for summary judgment in an adversary proceeding commenced under, *inter alia,* § 547,[1] by William A. Howison, chapter 7 trustee of the estate of The Freaky Bean Coffee Company (the "Trustee"); and (2) the November 16, 2012 final judgment entered in favor of the Trustee. For the reasons set forth below, we **REVERSE** the bankruptcy court's judgment under Counts I and II and **REMAND** for the entry of a judgment against the Trustee on those counts, we **VACATE** the bankruptcy court's judgment under Count III, and with respect to Count IV, we **REMAND** for proceedings consistent with this opinion.

## *BACKGROUND*

### I. Pre–Petition Events

#### A. The November 2007 Purchase of Maine Roasters by Freaky Bean

The Freaky Bean Coffee Company ("Freaky Bean") was a Maine corporation that formerly operated two retail coffeehouses, as well as a coffee roastery, in Maine. Jonathan R. Stratton ("Stratton") served as Freaky Bean's president and a

1. Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§ " refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.,* as amended.

director. During the same period, LBC, LLC, operating under the trade name Maine Roasters Coffee ("Maine Roasters"), operated five retail coffee establishments at various locations in Maine and roasted and ground coffee for a number of wholesale accounts.

On November 30, 2007, Freaky Bean and Maine Roasters entered into an agreement whereby Freaky Bean, through an affiliate, would purchase the Maine Roasters name, retail stores in Yarmouth and Falmouth, as well as substantially all of its equipment and personal property. To facilitate the purchase, Freaky Bean created a subsidiary named MRC Holdings, LLC ("MRC") to acquire the purchased assets and hold them separate and distinct from Freaky Bean. As part of the consideration for the purchase of Maine Roasters, MRC assumed liability for two promissory notes given by Maine Roasters on November 9, 2007, each in the principal amount of $319,000.00, to Milo and Razel Dazel, LLC, respectively. And as security for MRC's obligations to Milo and Razel, MRC granted them a first priority security interest in all of its assets, including those purchased from Maine Roasters. Additionally, Freaky Bean unconditionally guaranteed all of the obligations of MRC to Milo and Razel arising out of the purchase transaction.

Also pursuant to the purchase agreement, MRC issued 100,000 membership units, of which 92,000 units (Class A) were distributed to Freaky Bean and 8,000 units (Class B) were distributed equally to Milo and Razel. Pursuant to the MRC operating agreement, the company was to be operated by a Board of Managers. Stratton was appointed as president of MRC and one of the two Class A Managers; Randy Male ("Male"), Milo's president, was appointed as the sole Class B Manager. Operational decisions were to be made by majority vote of the managers, with the exception of certain actions over which either Class would have veto power.

Finally, as part of the sale transaction, Male was named an "honorary" board member of Freaky Bean. In practice, however, Male did not become involved in the day-to-day operations of MRC. He never voted on any issues surrounding its operations or signed any resolutions or other paperwork authorizing MRC actions. And he was repeatedly put off when he requested Board of Managers meetings.

## B. The December 2008 Repossession and Settlement Agreement

Following the purchase of the Maine Roasters assets, Freaky Bean and MRC experienced significant financial problems. Soon after the closing, MRC became delinquent on its payments to Milo and Razel.

On November 19, 2008, Milo and Razel declared MRC and Freaky Bean to be in default of their respective obligations on the notes and guaranty and made demand for payment in full. And shortly thereafter, they exercised their rights as a secured party and repossessed substantially all of their MRC collateral, virtually all of which had been the Maine Roasters assets sold by them to MRC. Attempting still to save *its* business, Freaky Bean required a cash infusion both to resolve its obligations under its guaranty to Milo and Razel and to other accounts payable, and to provide the working capital necessary to restructure a smaller, more profitable Freaky Bean.

On December 3, 2008, Stratton, on behalf of MRC (as its president and manager) and Freaky Bean (together, the "Stratton Parties"), and Male, on behalf of Milo and Razel, entered into a Settlement Agreement, Waiver of Debtor's Rights and Release of Secured Party (the "Settlement Agreement"). The Settlement Agreement

validated the repossession by Milo and Razel of the MRC assets and further provided that Milo and Razel would release the Stratton Parties from any remaining deficiency balance upon payment by MRC of:

(a) $10,101.92 to Milo, representing payments due under its note for September, October, and November 2008;

(b) $8,081.92 to Razel, representing payments due under its note for October and November 2008;

(c) $8,585.88, representing amounts due certain creditors of Maine Roasters which obligations MRC had assumed in November 2007; and

(d) $100,000 to Razel and Milo representing a partial (and now final) payment on the notes held by them.

Thus, in addition to the turnover of its assets to Milo and Razel, MRC was required to make payments to Milo and Razel totaling an additional $126,769.72. Of these payments, a total of $110,101.92 (items (a) and (d) above) was paid to Milo, and represents the payments that are the subject of this dispute.

### C. Funding of the Settlement Agreement and Freaky Bean Working Capital

Stratton was unable to obtain a loan from local banks to fund the downsizing effort and to provide working capital for Freaky Bean. He therefore turned to two of the existing Freaky Bean shareholders, James Walsh and Barb Heyl, for assistance. Stratton's plan was that Walsh, Heyl, and several others (all Freaky Bean shareholders) would form a new Maine corporation known as BeanCo. Then, Walsh and Heyl would each loan BeanCo $125,000.00, for a total of $250,000.00. Finally, BeanCo would make the $250,000 from Walsh and Heyl available to Freaky Bean pursuant to a Line of Credit Agreement between BeanCo and Freaky Bean. The foregoing loan structure was evidenced by contemporaneous promissory notes from BeanCo to Walsh and Heyl for $125,000.00 each and a $250,000.00 Line of Credit Promissory Note from Freaky Bean to BeanCo. Additionally, BeanCo executed security agreements in favor of Walsh and Heyl, pledging its assets as collateral.

Whether that plan was brilliant or flawed became moot, however, because the various parties became impatient and failed to act in accordance with the plan. Instead of waiting for BeanCo to be formed, have Walsh and Heyl write checks to BeanCo, and then have BeanCo write checks to various payees, Stratton simply instructed Walsh and Heyl to write checks to the parties he designated or obtained bank checks for that purpose. Accordingly,

(1) On November 26, 2008, Walsh provided a Bank of America check to Stratton in the amount of $60,000.00, representing a portion of his share of the loan proceeds. Walsh gave this check to Stratton with the "Pay to the Order of" line blank. Stratton filled in his own name and deposited the check in another Bank of America account (not belonging to Freaky Bean) on the same day and then caused Bank of America to issue a cashier's check in the amount of $25,000.00 payable to Milo ("Transfer No. 1").

(2) On December 3, 2008, Stratton met Walsh at a Bank of America branch and transferred the remainder of Walsh's share of the loan proceeds ($65,000.00) from Walsh's Bank of America account to another Bank of America account designated by Stratton (not belonging to Freaky Bean). Stratton then caused Bank of America to issue a cashier's

check in the amount of $25,000.00 payable to Milo ("Transfer No. 2").[2]

(3) On December 4, 2009, Heyl caused her bank to issue a cashier's check in the amount of $60,101.92 payable to Milo ("Transfer No. 3").[3]

## II. Bankruptcy Proceedings

An involuntary chapter 7 petition was filed against Freaky Bean on February 25, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the District of Maine. On March 18, 2009, the bankruptcy court entered an order for relief and the Trustee was appointed as the trustee in bankruptcy.

### A. The Complaint and Answer

On March 22, 2010, the Trustee filed a four-count adversary complaint against Milo. In the complaint, the Trustee alleged that Freaky Bean "made transfers to Milo in at least the total amount of $110,101.92 within the ninety (90) days prior to the [Petition] Date (the "Preference Period") and during the time period from ninety (90) days after the [Petition] Date to one year following the [Petition] Date (the "Insider Preference Period")." Accordingly, in Counts I and II, respectively, the Trustee sought a judgment against Milo declaring that the payments were avoidable under § 547 as preferential transfers and that he was entitled to recover the payments or the value thereof pursuant to § 550. In Count III, the Trustee requested an order pursuant to § 502(d), disallowing any claims of Milo against Freaky Bean until such time as the value of the settlement payments was paid back into the estate. And in Count IV, the Trustee argued, in the alternative, that if the settlement payments were made to Milo by MRC (and not Freaky Bean), then Freaky Bean, as a creditor of MRC, could avoid the settlement payments and recover a judgment for the benefit of the Freaky Bean estate pursuant to 14 Me.Rev.Stat. Ann. tit. 14, §§ 3576(2) and 3578 (Maine's Uniform Fraudulent Transfer Act), as well as §§ 544(b) and 550(a).

Milo filed a timely answer asserting various affirmative defenses, including that: (1) the complaint failed to state a claim; (2) the complaint was barred because there was no transfer of any assets of Freaky Bean; (3) the complaint was barred by the doctrine of release; (4) the complaint was barred because Milo was either a good faith transferee for value pursuant to § 550(b)(1) or a good faith transferee of the initial transferee pursuant to § 550(b)(2); (5) the complaint was barred pursuant to § 547(c)(1) (contemporaneous exchange); (6) the complaint was barred pursuant to § 547(c)(4) (new value); and (7) the complaint was barred pursuant to 14 Me.Rev.Stat. Ann. tit. 14, § 3579(6)(A) (new value). In its answer, Milo requested dismissal of the complaint.

**2.** On December 1, 2008, Stratton had sent an e-mail to Walsh, Heyl, and others, stating, among other things: "My plan for tomorrow is to give MRC another $25,000.[00] ... On Thursday I will pay MRC the remaining amount owed with Barb's money...."

**3.** On December 3, 2008, at Heyl's request, Stratton sent Heyl an e-mail asking her to have four checks cut against a portion of her share of the loan proceeds, since she was concerned that it would take too long for her $125,000.00 check to clear if it were placed in another bank account. Stratton asked Heyl to make out cashier's checks from her personal account as follows: (i) $60,101.92, payable to Milo, from MRC Holdings; (ii) $8,081.92 payable to Razel, from MRC Holdings; (iii) $5,815.24, payable to T & T Development, from Freaky Bean; and (iv) $4,467.13 payable to L & J LLC from Freaky Bean. And as to the balance of the $125,000.00, Stratton stated: "The remaining put into the TD Bank account [sic] when I get the other account open ill [sic] withdraw it and put it in there."

## B. The Cross–Motions for Summary Judgment

After conducting discovery, Milo and the Trustee filed cross-motions for summary judgment.[4] In its motion, entitled "Defendant's Consolidated Response to Plaintiff's (1) Opposition to Defendant's Motion for Summary Judgment; and (2) Cross–Motion for Summary Judgment," Milo claimed that it was entitled to summary judgment on all counts for the following reasons: (1) the settlement payments were not property of the estate because Freaky Bean never had an interest in them for purposes of §§ 547(b) and 550; (2) even if the settlement payments were property of the estate, they were nonetheless earmarked for payment to Milo and, therefore, were not recoverable by the Trustee; and (3) the Trustee's state law cause of action set forth in Count IV was not viable because Milo was never an insider of MRC and, in any event, Milo provided new value to MRC, in the form of the "release of over $700,000 in (at least partially) secured debt."

Milo further explained that there were "chronological problems with the Trustee's case." Specifically, Milo asserted that BeanCo was not incorporated until December 4, 2008 and, therefore, did not even exist at the time of the first two transfers made on November 26, 2008 and December 3, 2008, respectively. With respect to the third, and final payment, Milo argued: "[W]hile it is true that [BeanCo] came into existence on December 4th, the same date that the final settlement payment was made, it strains credulity to posit that on the same date that [BeanCo] was created, funds went from Heyl to [BeanCo]...."

After an April 26, 2011, non-evidentiary hearing on the cross-motions for summary judgment, the court took the motions under advisement. Thereafter, it entered an order denying both motions on June 9, 2011, indicating "although very few background facts [were] in dispute, the material facts [were] disputed." In its ruling, the court specifically instructed that trial on the merits would resolve disputes relating to, *inter alia:*

a. The context of, and mechanism by which, the funds at issue were paid to the defendant, including the overall plan for funding the payments (that is, whether the funds were advanced pursuant to a line of credit arrangement for the debtor);

b. Whether funds were paid to the defendant by or on behalf of the debtor or some other entity, *e.g.* M.R.C. Holdings;

c. Whether the funds at issue were property of the debtor (including issues regarding the discretion, if any, the debtor exercised over direction and disposition of the payments at issue);

d. Whether the facts establish insider relationships between critical actors; and

e. Whether the 'earmarking' doctrine applies insofar as the payments at issue are concerned.

Thereafter, on September 7, 2011, in accordance with the court's pre-trial scheduling order, the parties filed a Stipulation of Facts and Documents for Trial (the "Stipulation"). This Stipulation forms the basis of the background facts set forth herein and ultimately furnished part of the basis for the bankruptcy court's decision on the merits.

## C. Trial on the Merits

The court conducted a bench trial on September 4, 2012. Both Walsh and Heyl

---

**4.** Neither the Trustee's motion nor the Trustee's opposition to Milo's summary judgment motion are part of the record.

testified. Both indicated that, although they were aware of Freaky Bean's financial predicament, including its obligations to Milo and Razel, they left the decision regarding the use of the loan proceeds to Stratton's discretion. For example, Walsh agreed that "Freaky Bean needed to obtain an influx of either borrowed money or capital," and that when local banks declined to extend Freaky Bean a loan, he became one of two "private sources of funding." And at this time, he was mindful of Freaky Bean's obligation to Milo and Razel, but while he understood that the funds being advanced were for Freaky Bean's benefit, he did not in any way restrict their use. He specifically testified as follows:

Q: Did you put any limitations or restrictions on your agreement to lend in terms of who the money would go to?
A. No, I did not.
Q. And who made all of those decisions as to who the money would go to?
A. John Stratton.

. . .

Q: And you lent that money into the coffee company so Mr. Stratton could affect that turnaround plan, isn't that right?
A. Yes.

. . .

Q: The goal of the $250,000 loan, was it—what was the overall total of that loan transaction?
A: It was really to infuse cash into the business so we could pay our bills, pay our creditors, to keep—keep it running, essentially.

Walsh further testified as follows regarding the checks evidencing his loan:

Q. Is that an example of one of the checks you wrote?
A. Yeah, that is.

. . .

Q. Did you simply leave the 'pay to the order of' line blank?
A. Yes.
Q. Do you know who filled it in?
A. I believe it was John [Stratton].
Q. And with regard to the other checks you wrote to bring the total up to $125,-000–

. . .

Q. [D]id you determine how those checks were going to be paid, or did someone else?
A. They were paid to John or to— yeah, to John, I believe.... I wasn't told who to write them out to.

Heyl similarly testified on direct examination as follows, regarding the loan's purpose and its restrictions:

Q. Okay. Is that the combined $250,000 from yourself and Mr. Walsh that went to BeanCo. and is now being re-lent to Freaky Bean?
A. Correct.
Q. And is that your understanding of what would happen to those funds, that they were [ ] lent to Freaky Bean?
A. So that Freaky Bean could pay its debt and move the business forward, that's correct.
Q. And was it your understanding that you also provided working capital to Freaky Bean to operate going forward?
A. The assumption was that based on the numbers that had been done, there would be money left from the $250,000 to keep the business moving forward, that is correct.
Q. When you provided the $125,000 loan, did you put any restrictions or limitations on how that money had to be used?
A. I did not.

Q. Did you leave it to someone else's discretion how that would be used?

A. That is correct.

Q. Whose discretion did you leave it to?

A. It was John Stratton.

Q. As president of Freaky Bean?

A. Correct.

After presentation of the Trustee's case, Milo made an oral motion for directed verdict on Counts I and II, relating to Transfer No. 1, arguing that: (I) the subject transfer took place 91 days before Freaky Bean was placed into involuntary bankruptcy; and (ii) there was no evidence that Milo was an insider of Freaky Bean. The court responded to the motion by noting that Male was a director of Freaky Bean and that "[d]irector equals insider, even if you're a minority director and you have ... no real ability to control anything." Additionally, the court observed that Milo's "presence was ... so overwhelming and so compelling that the debtor had no choice but to pay them and that everybody knew...." Accordingly, the court withheld ruling on the motion until the close of all the evidence.

On behalf of Milo, Male testified that the Settlement Agreement identified the obligor under that agreement as MRC Holdings, as distinguished from Freaky Bean and, further, that the agreement did not contemplate payment by Freaky Bean. He further testified that none of the checks evidencing the advances under the loan were made payable to Freaky Bean or to BeanCo.

At the conclusion of the trial, the court took the matter under advisement and requested post-trial briefs. In its post-trial brief, as at trial, Milo continued to assert defenses it had raised previously in the context of its summary judgment motion, including that:

(1) the Freaky Bean estate had no interest in the settlement payments because BeanCo, the key link in the finding chain, was not in existence at the time the challenged transfers were made;

(2) there was no evidence that Stratton was acting for Freaky Bean in taking possession of the funds and arranging for their transfer to Milo. Rather, "[a]ll of the evidence clearly proves that when Stratton made the [t]ransfers, he was operating in his capacity as MRC's manager";

(3) even if Freaky Bean did have a cognizable interest in the settlement payments, they were still not recoverable from the Trustee because Heyl and Walsh had earmarked them to pay Milo;

(4) the Trustee's claim under 14 Me. Rev.Stat. Ann. § 3576(2) was not viable because i) there was no evidence that Freaky Bean was a creditor of MRC; ii) Milo was not an insider of MRC; and iii) Milo did not have reasonable cause to believe MRC was insolvent;

(5) the November 26, 2008 settlement payment was not recoverable as a preference because it was made 91 days before the Petition Date and because Milo was not an insider of Freaky Bean, the Trustee was not allowed to look to the one-year insider transfer period of § 547(b)(4)(B);

(6) Milo was not the initial transferee of the settlement payments, but rather, a mediate or intermediate transferee who took the funds in good faith, for value, without knowledge as to their voidability.

On November 6, 2012, the court ruled from the bench that the settlement payments represented by Transfer Nos. 1, 2, and 3 constituted preferential transfers under § 547. In reaching its decision, the court announced as a preliminary matter

that it was incorporating by reference, and relying upon, the stipulation which the parties submitted in anticipation of trial. The court stated:

> [A]lthough there is nothing prejudicial to either party in the stipulations, the stipulations very clearly outline relationships between and among the entities involved here, and I am incorporating ... by reference the stipulations which appear at ... docket number 45, as the ... accepted basis by both parties for addressing the disposition of this matter.

The court went on to dismiss as "red herring issues" certain of Milo's arguments, including: (1) whether or not the transfer was of an interest in property of the Debtor; (2) whether Milo was an insider at the time of the transfer; and (3) whether BeanCo was incorporated at the time of the challenged transfers. The court expressed the "real issue" as follows: "Where is the flow of the money and who had discretion of the money?" The court found that: (1) Walsh and Heyl made loan proceeds available, directly or indirectly, to Freaky Bean "for Freaky Bean's purposes, without reservation or direction"; (2) Freaky Bean made the payments "without earmarking" ... "noticing someone as a remitter on a check doesn't bestow a property interest in the funds to them"; (3) Freaky Bean made the payments "under the discretion of [its] president to be used as he chose"; (4) "a check written on the ninety-first day clears within 90 days" and, alternatively, even if a check cleared on the ninety-first day, "Milo, through Mr. [Male], was a director of Freaky Bean," and, as such, was a non-statutory insider. Based on these findings, the court concluded:

> I think that's an unnecessary finding of an insider, because again I say, more likely than not, it's been demonstrated that the checks all cleared within 90

days. ... So we show that it was to or for the benefit of a creditor. It was on account of an antecedent debt, which was the remaining obligation owed by MRC and guaranteed by Freaky Bean. It was within 90 days or, alternatively, if not within 90, 91, and to or for the benefit of MILO, an insider. The evidence is clear that, but for the transfer, MILO would be in the pool with other unsecured creditors who, at this stage, are ... projected to get less than 5% ..., so that it enabled the creditor to do better than it would have if—in the absence of the transfer.

Furthermore, because the court found that the challenged payments were, in fact, preferential transfers of an interest of the debtor in property, it declined to reach the final count of the complaint, Count IV, which sounded in state law, and was dependent upon a determination that the transfers in question were not transfers of an interest in property of the debtor, but, rather, MRC. On the same date, the court entered Final Judgment in favor of the Trustee and against Milo, in the amount of $110,101.92.

This appeal followed. On appeal, the parties reiterate the arguments presented below.

### JURISDICTION

■ A bankruptcy appellate panel is " 'duty-bound' " to determine its jurisdiction before proceeding to the merits, even if not raised by the litigants. *Boylan v. George E. Bumpus, Jr. Constr. Co., Inc. (In re George E. Bumpus, Jr. Constr. Co., Inc.)*, 226 B.R. 724, 725–26 (1st Cir. BAP 1998) (quoting *Fleet Data Processing Corp v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998)). A panel may hear appeals from "final judgments, orders, and decrees [pursuant to 28 U.S.C. § 158(a)(1) ] or with

leave of the court, from interlocutory orders and decrees [pursuant to 28 U.S.C. § 158(a)(3) ]." *In re Bank of New England Corp.*, 218 B.R. at 645. "A preference recovery judgment is a final, appealable order." *Riley v. Nat'l Lumber Co. (In re Reale)*, 393 B.R. 821, 825 (1st Cir. BAP 2008) (citation omitted), aff'd, 584 F.3d 27 (1st Cir.2009); see also *Belfance v. Buonpane (In re Omega Door Co., Inc.)*, 399 B.R. 295, 298 (6th Cir. BAP 2009) (citations omitted). Thus, we have jurisdiction.

### STANDARD OF REVIEW

██ A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo.* See *Lessard v. Wilton–Lyndeborough Coop. Sch. Dist.*, 592 F.3d 267, 269 (1st Cir.2010). "A finding is clearly erroneous when, although there is evidence to support it, the Panel is left with the definite impression that a mistake has been made." *In re Reale*, 393 B.R. at 825 (citation omitted). The bankruptcy court's determination that Freaky Bean had an interest in the transferred property presents a question of law and fact. *See id.* (citing *Advanced Testing Techs., Inc. v. Desmond (In re Computer Eng'g Assocs., Inc)*, 337 F.3d 38, 45 (1st Cir.2003); *Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.)*, 231 B.R. 829, 831 (1st Cir. BAP 1999)). "As for that hybrid—the mixed question of law and fact, our review is but slightly more nuanced." *Id.* "We review for clear error 'unless the bankruptcy court's analysis was based on a mistaken view of the legal principles involved.'" *Id.* (citations omitted).

### DISCUSSION

Although Milo identifies the bankruptcy court's denial of its motion for summary judgment as one of the two issues on appeal in its statement of issues and in the preliminary section of its brief, it ignores the summary judgment issue altogether in the argument section of its brief. Accordingly, this issue is waived (*see Eakin v. Goffe, Inc. (In re 110 Beaver Street P'ship)*, 355 Fed.Appx. 432, 437 (1st Cir. 2009)), and our review in this appeal is limited to the bankruptcy court's final judgment that the subject transfers constituted preferences voidable under § 547.

### I. The Standard

██ Section 547(b) provides:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). "The burden is on the Trustee to prove each of these elements, and the failure to do so will defeat its

preference claim." *In re Computer Eng'g,* 337 F.3d at 45 (citing § 547(g)).[5]

Here, three transfers are challenged as preferential. The first is represented by a $25,000.00 Bank of America cashier's check, dated November 26, 2008, made payable to Milo. The remitter on the check is MRC Holdings. The second is represented by a Bank of America cashier's check, dated December 3, 2008, in the amount of $25,000.00, also payable to Milo. The remitter on that check is also MRC. The third challenged transfer is represented by a check in the amount of $60,101.92, written on Heyl's account and payable to Milo. The reference on the check, however, is MRC.

## II. The Standard Applied

■ The "threshold requirement" of an avoidable preference under § 547 is a "transfer of an interest of the debtor in property," and it is the element at issue here. *Parks v. FIA Card Servs., N.A. (In re Marshall),* 550 F.3d 1251 (10th Cir. 2008); *see also Begier v. Internal Revenue Serv.,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (stating "[t]he reach of § 547(b)'s avoidance power is ... limited to transfers of 'property of the debtor[ ]' "). "Because the Trustee has the burden of proving the avoidability of a transfer under subsection (b) of [§ 547], the Trustee has the burden of proving that property is part of the bankruptcy estate." *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'ns, Inc.),* 554 F.3d 382, 400 (3d Cir.2009) (citations and internal quotations omitted).

■ The Code does not define "property of the debtor" as used in § 547(b). *Begier v. Internal Revenue Serv.,* 496 U.S.

at 58, 110 S.Ct. 2258. "Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors—'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Id.* The First Circuit has ruled that "[w]hen determining whether certain funds are considered 'an interest of the debtor in property,' the ability of the debtor to exercise control over the property can be determinative." [6] *In re Reale,* 584 F.3d at 31 (citing *In re Neponset River Paper Co.,* 231 B.R. at 833 (stating that the ability to exercise control over the property is sufficient to establish ownership); *Sigmon v. Royal Cake Co., Inc. (In re Cybermech, Inc.),* 13 F.3d 818, 820–21 (4th Cir.1994) (stating that dominion and control is sufficient to demonstrate an interest in property); *Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.),* 16 F.3d 313, 316 (9th Cir.1994) (looking to debtor's control over the transferred property to determine ownership)); *see also MBNA Am. Bank, N.A. v. Meoli (In re Wells),* 561 F.3d 633, 635 (6th Cir.2009) (stating degree of control a debtor exercises over the property transferred is the principal determinant of whether the debtor has an interest in property such that its transfer may be avoided under § 547).

■ A review of the record in this case does not reveal any exercise of ownership or control by Freaky Bean over the funds which were the subject of Transfer Nos. 1, 2, and 3. No checks were made payable to Freaky Bean. No funds were deposited in

---

5. Section 547(c) establishes exceptions for certain preferential transfers, "the avoidance of which would not further the purposes of § 547(b)." *United Rentals, Inc. v. Angell,* 592 F.3d 525, 528 (4th Cir.2010).

6. "Other courts have applied a diminution of the estate test." *In re Marshall,* 550 F.3d at 1256 (citations omitted).

a Freaky Bean bank account. The monies came from sources that were indisputably not Freaky Bean assets. The settlement funds for each transfer were paid by Walsh and Heyl. True, Stratton was the president of Freaky Bean. But he was also the president of MRC, and MRC was the primary obligor. And true, the ultimate goal of the Stratton plan, as set forth in the Stipulation, was to effect a "reboot" of Freaky Bean, and, not surprisingly, Walsh and Heyl were shareholders of Freaky Bean. But surmising that because the Walsh and Heyl funds were intended to benefit Freaky Bean, they were actually the property of Freaky Bean when paid to Milo inappropriately conflates two separate elements of the § 547(b) analysis: that the funds must be an interest of the debtor in property and that the transfer must be for the benefit of the debtor. The latter is obvious from the admitted facts and the testimony of the witnesses. The former has little support in the record.

Nor does the bungling of the plan involving BeanCo make any difference. The parties hoped to put distance between the Walsh and Heyl loans and Freaky Bean by introducing BeanCo as an intermediary. And they managed to foil their own plan. But the upshot was that, notwithstanding the failure of Stratton's plan to materialize, Stratton, Walsh and Heyl, whether by design or not, succeeded in keeping Freaky Bean's fingerprints off the funds that were paid to Milo. The court below assumed that because the stated goal was to save Freaky Bean, Stratton was acting as an agent of Freaky Bean when he paid Milo.[7]

But, again, Stratton was also the president of MRC and, in making that payment, Stratton was extinguishing a debt that was always acknowledged to be the primary obligation of MRC. When the respective burdens of proof are added to the mix (the Trustee has the burden of proving each element of § 547(b) by a preponderance of the evidence), we conclude that the bankruptcy court's finding that Freaky Bean had an interest in the proceeds of the Walsh and Heyl loans was clear error.

Because we hold that Freaky Bean did not have an interest in the funds paid to Milo, we need not reach the following questions decided by the court below: whether the transfers were made within 90 days; if not within 90 days, whether Milo was an insider with respect to whom the one year period applied; and whether the funds were earmarked. Nevertheless, believing it moot, the court below made no decision with respect to Count IV of the complaint. The parties are entitled to have the bankruptcy court make that determination in the first instance. Accordingly, we **REVERSE** the bankruptcy court's judgment under Counts I and II and **REMAND** for the entry of a judgment against the Trustee on those counts, we **VACATE** the bankruptcy court's judgment under Count III,[8] and with respect to Count IV, we **REMAND** for proceedings consistent with this opinion.

---

**7.** Indeed, the Stipulation between the parties and incorporated into the bankruptcy court's findings contains the following language:

> 9. MRC was a separate legal entity from Freaky Bean.
>
> . . . .
>
> 13. MRC was created to hold the Maine Roasters Assets being sold by LBC in a separate and distinct entity from Freaky Bean until such time as MRC paid the

entire purchase price in full, including, without limitation, the obligations to Milo and Razel Dazel pursuant to the Assumed Notes.

**8.** We vacate Count III as this count may be available to the Trustee in the event that the bankruptcy court enters judgment for the Trustee on Count IV.